Salvatore GIANGRASSO and Steve Pietrofesa, Plaintiffs,

v.

CBS, INC., MTM Enterprises, Inc., and Hugh Wilson, Defendants.

No. 80 CV 1293.

United States District Court, E. D. New York.

March 9, 1982.

---

James P. Malone, Mineola, N. Y., for plaintiffs.

Pryor, Cashman, Sherman & Flynn by Stephen F. Huff, Donald S. Zakarin, New York City, for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

The subject of this action is the alleged infringement of a radio play script and promotional presentation written by plaintiffs, which they copyrighted in August 1976.[1] The copyrighted work is about a radio station and its staff, and a "remote" broadcast the station sets up, which is interrupted by a robbery. In a general manner these same subjects appear in an episode of "WKRP Cincinnati," a television show written, produced and aired by defendants. Plaintiffs allege that both the episode and the entire program infringe the copyrighted work.[2] The action is before the Court on defend-

---

1. Plaintiffs also produced a recorded version of their script on an "Evetone Sound Sheet," but it was never copyrighted and is not part of the present action.

2. Plaintiff Pietrofesa stated on deposition that the first two pages of the script were not part of the claim. Upon reading the deposition before signing it, Pietrofesa made handwritten changes indicating that the entire script was

part of the claim. Under Rule 30(e), F.R.Civ.P., a witness may make such changes but is required to submit a statement of his reasons where the changes, as here, are substantial. In this case the changes themselves are self-explanatory, since the entire script is part of the copyrighted work claimed in the pleadings to be infringed, and they have been accepted.

ant's motion for summary judgment, and plaintiffs' cross-motion for summary judgment and other relief. For the reasons that follow, plaintiffs' cross-motions are denied and summary judgment is granted in favor of defendants dismissing the complaint.

To facilitate comparison of the respective scripts, some detailed description of each is necessary. Plaintiffs' copyrighted work consists of four pages that can be divided into two parts. The first two pages introduce the radio station WHY–53 and its staff, and were intended as a presentation to sell future episodes of the show on a syndicated basis. The last two pages contain plaintiffs' first installment of "WHY–53" for broadcast.

The presentation portion begins with a "dial twist opening" in which the radio dial is set to another station's broadcast before being tuned to WHY–53. The station and its staff are then introduced: "Medicine Man" Larry Lee Lawrence, to all appearances a smooth-talking morning disc jockey; Curt Curtis and Steve Stevens, the station's "crack news staff"; "Chuckling" Chuck Charles, the hyper-effervescent afternoon disc jockey; Thomas Thompson, the stations' out-of-date owner who is responsible for its being "five in his six station market"; and Strauss, a genial but bumbling engineer who enters as the lights in the station's newsroom go out.

The pilot episode of "WHY–53" begins with Larry Lee and Strauss griping about their assignment as they prepare for the remote broadcast at the opening of the Consolidated Bank. Strauss counts down "Five, four, three, two, one," but Larry Lee continues to say that he "can't stand doing these remotes." He then realizes he is "live" and introduces himself as "the medicine man, playing doctor with you all morning long." He then mentions that he is doing a remote from the bank, which permits the bank's manager to break in to identify himself and invite new depositors to open an account and receive a free ice crusher.

Right after Larry Lee says "everybody" has come in to see him "at the big bank opening," gun shots are heard, and a robber runs up, wheezing. All oblivious, Larry Lee approaches the robber and puts him on the air. Belligerent at first, and then bewildered by the disc jockey's manic "fun and games," "Simon didn't say" response to the robber's threat "put your hands on your head," the robber demands the contents of a jar Larry Lee has gladly told him holds the radio station's "WHY Win nickel contest." Keeping to his role as radio announcer, Larry Lee blithely ignores the robber's threats and gets him to guess for the nickels. The robber is wrong by one, but grabs the money anyway. As police noises are heard, the robber starts to flee but Larry Lee reminds him not to forget his suitcase (in which he presumably has put the money). The robber leaves, thanking Larry Lee, who describes the robber as "another happy WHY–53 listener," and breaks for the news. The news is Curt Curtis' report about a lone masked gunman holding up the Consolidated Bank at its opening. Curtis' closing aside is "too bad we didn't have someone there to cover that story."

Defendants' "Hold-Up" episode, broadcast in October 1978, opens at Del's stereo store where Herb Tarlek, general sales manager for radio station WKRP, is selling Del on the idea of a remote broadcast from the store to boost Del's sales. As they close their deal, the scene changes to the radio station where Bob Bruner, an aspiring but out-of-work disc jockey, is being turned down for a job with the station, which Andy, the station manager, tells him gently is "number sixteen in an eighteen station market." Carlson, the station's owner, breaks in with Tarlek, and they tell Andy (and Bruner) about the remote. Bruner leaves after being introduced, and Carlson grows expansive as he contemplates the prospect of sales and people looking for work with the station. Carlson and Andy then reject Tarlek and settle on Johnny Fever as the disc jockey to handle the remote.

The third scene returns to Del's store where Tarlek, Del, Johnny Fever and WKRP engineer Bucky Dornster are get-

ting ready for the remote and sale. Fever's responses to "rapid-fire" Del suggest he is taking a bemused, somewhat "laid-back" approach to the remote and the anxiety it visibly causes Del. Del goes through torment as Dornster, a union engineer and therefore treated as sacrosanct by everyone, carelessly and repeatedly bumps into expensive merchandise. After Tarlek leaves, Fever and Dornster start to test the remote setup. When Fever counts down, "5, 4, 3, 2, 1, power," the remote is hooked up but all the lights in the store have gone out, and confusion ensues.

The fourth scene cuts back to the radio station where WKRP's news announcer Les Nessman is closing his news report with a taped voice-over describing himself as "one of journalism's most trusted voices," accompanied by a fanfare and the sound of presses. Ignoring Andy and Carlson's suggestion that the voice-over is "extreme," Les leads into the remote, inviting the audience to "get mellow and blow the day with Dr. Johnny Fever." Although Les switches to the remote—"take it away, Doctor"—all is still confusion at Del's, and these are the sounds that come over the airwaves. Carlson demands something to cover up this gaffe, and the first act closes as Les replays his voice-over.

Things have calmed down as the second act and fifth scene open at Del's store with "Dr. Johnny Fever" finishing a record. There are no customers and Del goes into an extended, frenetic sales pitch. After he closes, he complains about the havoc the remote has wreaked. Someone comes in but only asks to use the bathroom. Del tells him where it is, then continues harping at Fever, who breaks off answering Del to announce the time and station check for the remote: "This is . . . Dr. Johnny Fever . . . making a house call at Del's Stereo and Sound Shop." He then describes the scene as the visitor returns from the bathroom, talks to Del and, to the surprise of all, pulls a gun. The scene changes to the station, where Andy, Carlson and Les are listening in fascination to Fever's live description of what sounds like a hold-up, and then quickly to Carlson and Andy speeding to Del's to the rescue, only to head back with exaggerated abruptness when they realize that the hold-up man is armed.

The eighth scene returns to Del's shop where the hold-up man turns out to be Bob Bruner. Spurning money and equipment for the "love and adulation" he believes will be his as a famous "dee-jay," he explains to Fever and an unbelieving Del that he wants to "hi-jack" the remote broadcast to get publicity. Because of the gun, Fever lets him take over, but Fever's sympathies are aroused and he advises Bruner to change his air name to "Bobby Boogie." Bruner does so, and soon his genuinely smooth technique is revealed through a voice-over of the remote being listened to at the station during another quick scene change. As the station staff then all scramble to call the police, the scene changes for the last and ninth time.

In the meantime, Johnny and Bob have been talking about radio work and Bob's plight as an out-of-work announcer. When Bob shows remorse at using a gun and fears he has ruined all his hopes because he is likely to be arrested, Johnny decides to help, and lets himself be seized by the police as the program's hijacker.

A news postscript follows the second act. Fever comes on screen and a voice-over describes his release and the composite drawing of "Bob Boogie" that the police have made from the details Fever provided. The drawing turns out to be a picture of Richard Nixon.

■■ To succeed on a claim of copyright infringement, a plaintiff must prove, in addition to ownership of the copyright, that "defendants 'copied' his work and that they 'improperly appropriated' his 'expression.'" *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, (1981), quoting from *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946). Typically, a defendant's copying

may be established (inferentially) by proof of access to the copyrighted work, and a "substantial similarity" between the two works. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977). For the sole purpose of their motion for summary judgment, defendants have conceded the issue of access, and have focused on establishing the absence of any actionable "substantial similarity" between the works, as a matter of law.

■ Copyright protection for "original works of authorship," 17 U.S.C. § 102(a), extends only to the "expression of [an] idea—and not to the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). See *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1977); 17 U.S.C. § 102(b). Courts and commentators generally concur that "no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

Attempts to define this dichotomy between the unprotectible idea and protectible expression are necessarily vague. In delineating what has become known as the "abstractions" test, Judge Learned Hand wrote that

> "[u]pon any work . . . a great number of patterns of increasing generality will fit equally well as more and more of the incident is left out. The last may be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

Another concept which courts have utilized in conjunction with Judge Hand's abstractions approach is Professor Zechariah Chafee's suggestion that copyright "protection covers the 'pattern' of the work . . . the sequence of events and development and interplay of the characters." Chafee, Reflection on the Law of Copyright, 45 Col.L. Rev. 503, 513 (1945). See generally, 3 Nimmer on Copyright, § 13.03[A] [1] (1981). Thus, the Court of Appeals has stated that "the essence of infringement lies in a taking not of a general theme but in its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's TV Workshop, supra*, 533 F.2d at 90.

With these principles in mind, we turn to a closer examination of the works and the claimed instances of improper appropriation to determine whether there is any genuine issue that the works could be considered "substantially similar." Both plaintiffs' copyrighted work and the defendants' TV program are about the interactions of a radio station staff, and the specific episodes which form a major basis of the infringement claim are both about a remote broadcast, which the station has undertaken for an advertiser, that is interrupted on the air by a man with a gun. Both of the works are intended as comedies. Plaintiff Pietrofesa stated, however, that the claim did not seek protection for the idea of a group of people interacting off and on the air on a radio station (Tr. 10–11, 77, 100), and it is clear that recovery could not be had for this concept alone. See, *e.g., Nichols v. Universal Pictures Corp., supra*, 45 F.2d at 121. Even assuming that defendant may have copied the idea of a remote broadcast interrupted by a robber with a gun, such copying also is not actionable because it is only of an idea, and the handling, scenes, details and characterization used by plaintiffs and defendants in their works based on this idea are unquestionably not substantially similar.

First, the "hold-up" during the "WKRP" remote differs from the "WHY–53" remote in that it involves a "hi-jacking" of a con-

tinuing radio broadcast and not an abrupt theft of money, from either the station or the station's advertiser. Furthermore, the "hold-up" in "WKRP" is chiefly a vehicle for expounding the show's main plot line of an out-of-work radio announcer who is desperate to find a job and publicize himself. The "WKRP" disc jockey is necessarily aware of what is going on, and actually sympathizes with the "hi-jacker's" plight and purposely helps him escape capture by the police.

Larry Lee Lawrence's role in "WHY–53" is markedly different. When he is "live" on the air he is oblivious to everything but his work, even gun shots. The comedy in this part of "WHY–53" is that Larry Lee doesn't know that the person he has chosen to stop, has just held up the bank sponsoring the remote and is not an ordinary passerby. Necessarily the unwitting nature of his role carries through his reminder to the thief to take the suitcase just as the police come. Although Larry Lee may truly "hate" doing remotes, his participation is unwavering. The contrast between this treatment and Johnny Fever's surprising and deliberate abetting of Bob Bruner's "hi-jacking" is underscored by considering the claimed similarity that on each show the hold-up man broadcasts over the radio. In "WHY–53" the robber understandably is unwilling to speak even in an interview, except that he sees a chance to get more money. The comedic point is to have the radio announcer and the robber interact as if the event were nothing more than a typical on-the-spot interview of any passerby. In "WKRP" the hold-up man's only purpose is to take over the remote as disc jockey, without thought for money. Moreover, the disc jockey is not actually involved in the broadcast.

Other similarities are claimed,[3] particularly in the characters. But here plaintiffs' claims suffer "the penalty an author must bear for marking [characters] too indirectly," *viz.*, "the less developed the characters, the less they can be copyrighted." *Nichols v. Universal Pictures, supra*, 45 F.2d at 121. In delineating in the *Nichols* case when copyright protection for a character might be proper, Judge Hand wrote:

> "If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's *Doctrine of Relativity* or Darwin's *Origin of Species.*" *Id.*

The characters in plaintiffs' short work are primarily "types" with little limning or development beyond their positions at the station. Of the characters claimed to be copies, plaintiffs' station owner, Thomas Thompson, is never developed beyond the easy target for ridicule that a young audi-

---

**3.** Plaintiffs point to the advertising pitch made by their bank manager, and the analogous, but much longer spiel reeled off by Del. But this similarity in dramatic sequence, like the countdown before the start of the remote, and the robber's use of a gun and the arrival of the police, is clearly nothing more than a "scene a faire" which "would necessarily result from the fact that the common idea is only capable of expression in more or less stereotyped form." *Reyher v. Children's Television Workshop*, 533 F.2d 84, 91 (2d Cir. 1977). And as plaintiff Pietrofesa acknowledged, there was no literal similarity of expression between the two speeches.

Plaintiffs also make much of an asserted coincidence between their disc jockey once being called "medicine man," and the frequent references to Johnny Fever as "doctor" making "house calls." While the words connote slightly different medical personae, the insignificance of the similarity in the underlying idea is underscored by Pietrofesa's acknowledgment that referring to a "deejay" as a "doctor" was fairly common on radio.

Another claimed coincidence is the "dial twist opening," but nothing in the record before the Court demonstrates that this was part of the "WKRP" show, and Pietrofesa acknowledged that such an opening was in common use.

ence today could find in a broadcasting professional who favored "soft sounding music" and objected to the Beatles, and who is pointedly described as being responsible for his station being fifth in a six station market. WKRP's owner, Carlson, hardly resembles even this scant characterization, his comedic persona in the "Hold-Up" episode being chiefly that of a boss afflicted with rarely realized pretensions to success, who is not in as complete control of his station and staff as he would like.

Practically nothing is revealed in the script about the character of the "WHY–53" newscasters, while Les Nessman on "WKRP" is clearly presented as unabashedly self-aggrandizing and pompous. The depictions of the radio station engineers, Bucky in "WKRP" and Strauss in "WHY–53", seem superficially similar: in each the lights go out on the engineer. But again, closer examination reveals how much they differ. The "WHY–53" presentation draws humor only from having Strauss act unprofessionally—he calls for a copper penny to fix a blown fuse. (Surprisingly, however, no technical mishaps occur during the remote.) In "WKRP," where the mishap does occur during the remote, the comedy is left simply to the coincidence of technical failure with the moment of expected success, without an overt underlining of the engineer's incompetence. Furthermore, most of the comedy about the engineer turns on his repeated knocking into and breaking expensive stereo equipment, and his indifferent attitude to everyone and everything, including the hijacker and his gun, engendered by his status as a union man.

In sum, comparison of the two works reveals that their similarity exists only at a level of abstractions too basic to permit any inference that defendants wrongfully appropriated any "expression" of plaintiffs' ideas. Furthermore, plaintiffs' characters are too undeveloped to permit protection, and even those characters in defendants' show, who exhibit a surface similarity to plaintiffs' because they share the same role (station owner, engineer or newscaster), have been clearly shown to be too dissimilar in treatment to permit an inference that defendant took their "expression" from plaintiffs.

■■ Although "substantial similarity is customarily an extremely close question of fact" and therefore an issue not readily susceptible to disposition on summary judgment, *Hoehling v. Universal City Studios, supra*, 618 F.2d at 977, the lack of substantial similarity between the works has been sufficiently established on the present record to warrant dispensing with a full trial on this issue.

■ Plaintiffs also seek to recover for unfair competition, but this claim too is based on defendants' alleged copying of their work. Section 301 of the Copyright Act provides:

"(a) On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of the copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date, whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301.

Courts in this circuit have consistently recognized that claims for unfair competition are "equivalent to exclusive rights within the general scope of copyright" and are preempted by this provision. See *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir. 1980); *Orth-O-Vision, Inc. v. Home Box Office*, 474 F.Supp. 672, 683–84 (S.D.N.Y.1979).

■ Plaintiffs nonetheless assert that their claim is preserved because it is a "cause of action arising from undertakings

commenced before January 1, 1978." 17 U.S.C. § 301(b)(2) (1976). Although plaintiffs' work was copyrighted in 1976, "WKRP" was first broadcast in September 1978. Therefore, the present cause of action cannot be deemed to have arisen prior to 1978 within the exception to the preemption clause. *See Birnbaum v. United States*, 588 F.2d 319, 326 n.15 (2d Cir. 1978).

 Plaintiffs' final claim is based on the common law theory of implied contract, although the pleadings are unclear whether the contract is one implied in law or in fact. It is apparent, however, that such claims must be based upon a direct submission of the work to the defendants. See *Faris v. Enberg*, 97 Cal.App.3d 309, 158 Cal.Rptr. 704 (1979); *Grombach v. Waring*, 293 N.Y. 609, 615–16 (1944). Since plaintiffs admit that they never directly offered their script to any of the defendants, the implied contract claim must fail.

Accordingly, summary judgment is granted for defendants dismissing the entire complaint.

SO ORDERED.