Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that plaintiffs' motion for leave to file a consolidated response to defendants' motions to dismiss and for summary judgment be and is granted.

IT IS FURTHER ORDERED that plaintiffs' motion for enlargement of time in which to respond to defendants' motions to dismiss and for summary judgment be and is granted.

IT IS FURTHER ORDERED that plaintiffs' motion for an award of fees, costs and expenses be and is denied.

IT IS FURTHER ORDERED that plaintiffs' motion to amend by interlineation plaintiffs' memorandum in opposition to defendants' motions to dismiss and for summary judgment be and is granted.

IT IS FURTHER ORDERED that plaintiffs' motion to disallow defendants' memorandum opposing plaintiffs' motion to strike be and is denied.

IT IS FURTHER ORDERED that defendants' motion for an extension of time in which to respond to plaintiffs' motion to strike be and is granted.

IT IS FURTHER ORDERED that defendants' motion to dismiss plaintiffs' complaint be and is denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment be and is denied.

IT IS FURTHER ORDERED that plaintiffs' motion to strike be and is denied, with the exception of defendants' twelfth affirmative defense which is stricken.

Andrew SMITH, Plaintiff,

v.

Hannah WEINSTEIN, Columbia Pictures Industries, Inc., Sidney Poitier, Melville Tucker, Francois Demenil, Bruce Jay Friedman, Defendants.

No. 80 Civ. 7057(ADS).

United States District Court, S.D. New York.

Jan. 24, 1984.

Whitman & Ransom, New York City, for plaintiff; Max F. Schutzman, Michael C. Pelletier, Louis A. Dejoie, New York City, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants; Stephen F. Huff, Donald S. Zakarin, Tom J. Ferber, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

Plaintiff Andrew Smith, a professional comedy writer, asserts in this action that defendants Hannah Weinstein, Columbia Pictures Industries, Inc. ("Columbia"), and various persons engaged by Columbia to write, produce, and direct the movie "Stir Crazy" illegally used plaintiff's original ideas and expression in making the film. The court has jurisdiction of the copyright infringement and unfair competition claims under 28 U.S.C. § 1338(a) and (b). Invoking the theory of pendent jurisdiction, plaintiff joins with his federal claims related state law claims of breach of express and implied contract and breach of a confidential relationship. Defendants move for summary judgment on all claims, arguing that the material facts are fully developed, that they are entitled to judgment as a matter of law, and that pendent jurisdiction should not be exercised. Defendants' motion is granted on the claims of copyright infringement and unfair competition, and defendant Weinstein's request that the pendent state-law claims against her be dismissed is also granted, without prejudice to plaintiff's right to pursue the claims in an appropriate state court.

The relationship between Mr. Smith and Ms. Weinstein is central to plaintiff's claims. They first met at a 1970 political rally organized by Ms. Weinstein for which Smith contributed jokes. Smith Deposition at 20–21, (Feb. 25, 1981), 160–61 (April 14, 1981). This encounter sparked a friendship to complement the professional relationship that eventually arose between them. Smith Affidavit ¶ 5 (Dec. 30, 1982). Mr. Smith terms this relationship "extremely close;" he was invited to the Weinstein home to celebrate Passover, and often to dinner; he dated Ms. Weinstein's daughters; and he escorted her to the opening of "Justine," a film she produced. Id.; Smith Deposition at 181–182, 196–98. He claims Ms. Weinstein would call him from time to time to ask about his most recent ideas and involvements, and he submitted various works for her review, comments, and consideration for possible production. Ms. Weinstein rejected all his submissions.

In October 1975, Smith read an article in the Wall Street Journal about the annual prison rodeo held at Huntsville Prison in Texas. The article inspired him to write a screenplay on the subject. He went to Huntsville to view the prison rodeo, to interview prisoners, and to take in the advertising and production of the rodeo. Shortly after he returned from Huntsville, plaintiff claims Ms. Weinstein made one of her periodic calls to find out whether he was working on anything new. He told her of the prison rodeo screenplay project and described how he had arrived at and cultivated the idea. She responded enthusiastically, encouraging him to do a treatment for

her review and suggesting that she might produce the resulting screenplay. *Id.* ¶ 7.

Plaintiff presented several treatments for Weinstein's review, as well as a full length script, "The Klu Klux Klocks Company" ("KKK"), which he completed and registered with the Writers Guild of America in December 1975. His agent, to whom he also gave a copy of the script, counseled plaintiff to formalize Ms. Weinstein's rights to the script in a contract and to make clear to her that she had no greater interest in his script than any other solicited producer. Smith Deposition at 222, 228. "Up to this point," plaintiff contends, his relationship with Weinstein "was one of absolute trust and confidentiality," on which plaintiff had relied in exposing his works "freely and with this understanding." Smith Affidavit ¶ 8. But plaintiff decided to follow his agent's advice, and demanded a contract or the script's return. Weinstein allegedly took the demand as a personal insult, refused a contract, and returned the script. Smith Deposition at 288.

During the ten-month period that followed this rather acrimonious exchange Smith attempted unsuccessfully to sell his script to other producers. He claims that, as a result of his efforts, he gained the reputation as the originator of the prison rodeo screenplay concept. *See* Complaint ¶¶ 24–25. Then, in October 1976, the parties resumed communicating with each other, and Weinstein asked whether plaintiff's script was still available and whether he would be willing to rewrite it. Their discussions led to a written contract under which plaintiff was to write treatments for Ms. Weinstein to review and market during a three-month period. The parties met frequently, including once with Richard Pryor, whom plaintiff suggested for a lead role, but ultimately Weinstein rejected all of plaintiff's treatments. Smith Affidavit ¶¶ 8, 9, 10, 11. When the contract terminated, so apparently did their professional involvement.

Weinstein did not, however, abandon the prison rodeo concept. She routinely report-

ed her potential projects to an executive at Columbia, who expressed interest in the prison rodeo idea. In October 1978, after one writer unsuccessfully drafted a script on the subject, Columbia engaged a well-known playwright, defendant Bruce Jay Friedman, to continue the effort. Friedman did his own research, including a trip to the Huntsville prison rodeo, and claims that he never saw any of plaintiff's drafts until after he had written the final shooting script for the movie "Stir Crazy."

## I. *Copyright Claim.*

"Stir Crazy" is the story of two unsuccessful New York actors, one white with an urbane, sensitive nature and the other black and streetwise, who move to the Sunbelt to find greener pastures for their talents, get falsely convicted for robbing a bank, and are imprisoned for long terms. The black protagonist, Harry, played by Richard Pryor, quickly works his way into the prison subculture and becomes friendly with a small group of convicts. In the meantime Skip, the white protagonist, discovers, to his and everyone else's surprise, that he is a master rodeo rider. The warden looks to Skip to win him big money in the annual prison rodeo, and Skip agrees, in exchange for special privileges, including the right to select his own rodeo team. Skip selects as his team the group of inmates Harry has befriended, and together they plan and execute an escape on rodeo day. At the end of the film, Skip and Harry drive off to freedom with the social worker sister of their attorney, the sister having fallen in love with Skip, and the attorney having established the innocence of Skip and Harry on the bank-robbery charge.

A comparison with plaintiff's works uncovers only superficial similarities. In KKK, plaintiff's principal work, Raven, a streetwise black and former inmate of a Southwestern prison who has set up his own clock company since his release, returns to the prison purportedly to strike up business with the prison warden. He proposes to make the prison's annual rodeo a financial success by turning it into a weekend outing, and by increasing the brutality

of its events to spark public interest. The rodeo would also fill a hotel that the warden's father-in-law has built next door to the prison, and which has had no guests since its opening. In exchange for these services, Raven proposes to sell the warden clocks for each cell in the prison and for each room in the nearby hotel. While he negotiates and executes this deal, Raven has an affair with the warden's wife, whose promiscuous propensities exceed even her rabid racism. Raven's real motive becomes apparent as the play develops. He plans to fill the clocks with dynamite and blow up the prison, an institution he despises. The inmates suffer great violence in the rodeo events, and at one point threaten Raven's life, but the plan succeeds. The script ends with the prison exploding, the rodeo drawing to a close, and Raven making a clean getaway.

Plaintiff authored other prison rodeo treatments prior to the KKK script. "The Last Arena" is the story of a "baby faced Texas boy" named Christy, who kills his father and five brothers and is given favored treatment by a prison official, Lovell, with whose wife he has an affair. Christy is enlisted into the rodeo, becomes alienated from the prison, and prods Lovell into the rodeo ring where Lovell is gored to death, after which Christy is gunned down during his escape on a bronco. The post-KKK treatments tend to focus on the relationship between a black flim-flam specialist, to be played by Richard Pryor, and a white, "top hand" rodeo rider. All are heavily dependent upon KKK and its characters. In "Cowboys and Niggers" the white cowboy hero (to be played by Caan) has an affair with the warden's promiscuous wife. The jive black hero is called "Pryor," and is imprisoned unjustly after a shouting match with a black sentencing judge. Pryor is enlisted to care for the warden's books and taxes. Pryor is an operator who wants to use the rodeo to escape and seeks in the process also to rob the box office. The white hero disapproves, but they have become good friends; so when he notices that Pryor is about to be caught despite using disguises, he allows himself to be thrown off a bull and gored to death as a sacrifice for his black friend. Pryor is so impressed that he walks back into prison with the bag of money to help the prisoners he had intended to abandon. In "The Prison Rodeo," Caan is still the trusted, white, cowboy prisoner, and Pryor returns to prison after a new conviction. As in KKK, Pryor plays a role in enhancing the significance and brutality of the rodeo, and sleeps with the warden's wife. The main device in this treatment, however, is the use of drugs by the warden to keep the prisoners passive, and later by Caan and Pryor to prevent further bloodshed at the rodeo and expose the prison's conditions. Their plan succeeds, and Pryor leaves prison when his sentence ends.

The first of three treatments titled "Hard Money" features a white cowboy, who has a girlfriend in the women's wing of the prison. The jive, black former convict is named Raven, as in KKK, and becomes the warden's wife's lover. The two prisoners use the rodeo as a means of escape, and accomplish their objective with the help of the warden's wife, who supplies a huge dynamite cake which Raven uses to blow up the prison. The second version of "Hard Money" tracks the first to an extent, but in this story the warden catches Raven and his wife in bed. Raven gets gored at the arena, but nevertheless manages to light the candles on the explosive cake the warden's wife provides, and escapes in disguise with his cowboy friend and the box office receipts. The warden's wife chooses to remain and be crowned rodeo queen as the prison blows up. The third "Hard Money" is a more detailed version of the second, with several insignificant changes.

Plaintiff claims that "Stir Crazy" infringed his various prison rodeo treatments and his full-length screenplay, KKK. He acknowledges the well settled principle that copyright protection extends only to an author's original expression of an idea and not to the idea itself, *see, e.g., Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980,

97 S.Ct. 492, 50 L.Ed.2d 588 (1976), but argues that defendants' movie and their various preliminary scripts have gone beyond this threshold. Although he alleges numerous instances of copying, *see* Smith Affidavit ¶¶ 13, 14 & Ex. 2 (Dec. 30, 1982), he points to five principal areas in which the alleged copying of expression is paramount: 1) the device of a rodeo which motivates the chief protagonist to escape and dictates the manner of escape; 2) the use of an inexperienced protagonist "city boy" who comes between the warden and the former "top hand" and gains favors by agreeing to compete; 3) the role of the city-boy in upsetting the warden's plans for the use of the proceeds from the rodeo and from the hard money event; 4) the characterization of the white and black protagonists and their roles in the rodeo; and 5) the use of a mass-murderer prisoner who terrifies the other prisoners but befriends the protagonists.

Defendants disagree with plaintiff's characterization of these themes as copyrightable expression and argue that as a matter of law the lack of substantial similarity between their film and plaintiff's works compels an award of summary judgment. "Because of the inherent difficulty in obtaining direct evidence of copying, it is usually proved by circumstantial evidence of access to the copyrighted work and substantial similarities as to protectible materials." *Reyher v. Children's Television Workshop*, 533 F.2d at 90; *see Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Defendants concede access for the purpose of this motion. *See* Def. Memorandum at 12. Therefore the sole question on this claim is whether a genuine issue of fact exists as to substantial similarity.

■ Plaintiff argues that, under Second Circuit law, substantial similarity necessarily presents a close factual issue that cannot be disposed of on summary judgment. *See Arnstein v. Porter*, 154 F.2d 464, 473 (2d Cir.1946). This is not the present state of the law. "In this Circuit, a defendant's

motion for summary judgment on a copyright claim may be granted, 'if, after assuming copying, the Court finds that any similarity between the works is insubstantial,'" *Warner Bros. Inc. v. American Broadcasting Co.*, 530 F.Supp. 1187, 1190 (S.D.N.Y.1982), *aff'd*, 720 F.2d 231 (2d Cir. 1983) (quoting *Musto v. Meyer*, 434 F.Supp. 32, 36 (S.D.N.Y.1977), *aff'd*, 598 F.2d 609 (2d Cir.1979)). Where, as here, the works at issue have been read and viewed in their entirety, the court may rule as a matter of law that no reasonable juror could find substantial similarity. *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980); *see also, Giangrasso v. CBS, Inc.*, 534 F.Supp. 472, 478 (E.D.N.Y.1982). Thus, courts in copyright actions are permitted "to put 'a swift end to meritless litigation' and to avoid lengthy and costly trials." *Hoehling*, 618 F.2d at 977 (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980)).

■ The test for substantial similarity is most concretely stated as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966); *see Werlin v. Reader's Digest Association, Inc.*, 528 F.Supp. 451, 461 (S.D.N.Y.1981). "Stir Crazy" is not substantially similar to plaintiff's works as a matter of law under the most generous conceivable application of this standard. Some similarities exist, but at a level of expression either too general or too insignificant to be protectible. When viewed overall or in detail "Stir Crazy" and its particular scenes and characters are substantially dissimilar to anything done by plaintiff.

■ "Copyrights ... do not protect thematic concepts or scenes which necessarily must follow from certain similar plot situations." *Reyher*, 533 F.2d at 91. In order to show that defendants copied his particular expression, Smith must show that they took more than his general theme; he must prove "similarities of treatment, details, scenes, events, and characterization." *Id.;*

*see Giangrasso,* 534 F.Supp. at 476. Moreover, no character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines. *See Warner Bros., Inc.,* 530 F.Supp. at 1193.

Plaintiff suggests that defendants copied his use of the prison rodeo as the vehicle by which the protagonists plan and execute their escape. Plaintiff's use of the prison rodeo idea is not copyrightable; the rodeo was a newsworthy event, placed in the public domain through its treatment in various news articles. *See Hoehling,* 618 F.2d at 978 & n. 5. Plaintiff's development of the rodeo as an escape vehicle is protectible, but only at a level that particularizes this general theme into characters, details, and events. At this level the similarities between his and defendants' work are insignificant. For example, in plaintiff's story the warden makes the rodeo overly violent to enhance its popularity and increase the revenues it generates, and the protagonist escapes either on the back of a bull after the prison is blown up, *see* KKK, Def. Ex. 2, or in disguise after knocking off the ticket office, *see* Cowboys and Niggers, Def. Ex. 3. Defendants' use of the rodeo differs dramatically. Their escape scene, which involves a well-crafted plan, with outside help, to slip underneath the grandstands and through a grill in the outer wall, either differs completely from plaintiff's, *see* KKK, or is too substantially detailed to warrant comparison, *see* Cowboys and Niggers. Similarly, the warden's intent to retain the rodeo proceeds instead of passing them on to the prisoners, the intrusion of a "city boy" protagonist into the warden's plans, and the use of the "hard money" event state themes too general to warrant protection. At the requisite level of expression no similarities exist.

Plaintiff has also failed to establish proof of character infringement. A "city boy," a "top hand", or a black protagonist played by Richard Pryor are characterizations too general to deserve protection; "the less developed the characters, the less they can

be copyrighted." *Nichols v. Universal Pictures, Corp.,* 45 F.2d 119, 121 (2d Cir.), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1930). The protagonists in Smith's various scripts bear virtually no similarity to those in the movie, other than that they are prisoners or belong to certain racial or demographic groups. As Judge Neaher recently stated, in deciding whether a "sitcom" episode infringed a submission for that program where both involved a radio station remote broadcast interrupted by a robber with a gun, "comparison of the two works reveals that their similarity exists only at a level of abstraction too basic to permit any inference that defendants wrongfully appropriated any 'expression of plaintiff's ideas.'" *Giangrasso,* 534 F.Supp. at 478.

This discussion of similarities has necessarily been superficial, as the similarities are negligible and concern only "non-copyrightable elements of the plaintiff's work." *Hoehling,* 618 F.2d at 977. The dissimilarities between "Stir Crazy" and plaintiff's ideas and treatments further reveal why no copyright violation occurred. "Stir Crazy" has little literary value, but it is subtle, witty, well written, and credible enough to be good humor; it has no overt sexual scenes (no warden's wife); the characters, including the family-killer giant who befriends and helps the heroes, are well developed and cleverly used. KKK and plaintiff's other treatments lack all these qualities; they are heavy-handed, with overt and tasteless sexual scenes, and characters and portrayals that are dull and incredible, including for example the cake that blows up the prison and a prison riot that Raven improbably quells with verbal razzle-dazzle. When examined in the briefs, plaintiff's recitation of similarities appears to have some substance. But when the scripts are actually read, the claim of copyright violations is revealed as meritless.

Plaintiff's claim can be seen as an accusation of "comprehensive nonliteral similarity," 3 Nimmer § 13.03[A][1], as discussed in terms of the "idea-expression dichotomy" in Judge Newman's recent opinion in

**1304**

*Warner Bros., Inc.,* 720 F.2d at 240–41. Even assuming that "Stir Crazy" was written with the KKK script in hand, the "numerous differences .... undercut substantial similarity." In this case, the story and characters in "Stir Crazy" do not even stir one's memory of any copyrighted idea or characters in KKK or Smith's other treatments. *See id.* at 241. Defendants are granted summary judgment on plaintiff's copyright claim.

## II. *Pendent Jurisdiction.*

 Dismissal of plaintiff's federal claim raises the question whether the state-law unfair competition, breach of contract, and breach of confidential relationship claims should be dismissed without prejudice to their assertion in state court. Since diversity is lacking—Smith and Weinstein are both New York domiciliaries—the court has no independent jurisdiction of the state-law claims beyond its authority to consider them pendent to substantial federal claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1338(b). A federal court lacks the power to exercise pendent jurisdiction over state-law claims if the federal claim does not possess "substance sufficient to confer subject matter jurisdiction on the court," *id.,* which would be the case if "prior decisions inescapably render the claim frivolous," *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973). This rule is inapplicable here. While plaintiff's copyright claim seems meritless upon close examination and analysis, it is not "constitutionally insubstantial", *id.,* nor is it frivolous in the sense·of having been asserted solely for the purpose of establishing federal jurisdiction. Here, the copyright claim cannot be said to be a sham; rather it is a claim that could reasonably be advanced, albeit with little hope of vindication by any court familiar with the entire record as well as the controlling cases in this Circuit.

 Assuming, however, that the copyright claim vested this court with authority to adjudicate the pendent claims, whether that jurisdiction should be exercised remains a matter of discretion. Not only must plaintiff's federal and state-law claims "derive from a common nucleus of operative fact," such that "he would ordinarily be expected to try them all in one judicial proceeding," *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138, but the court must weigh whether considerations of comity, judicial economy, convenience, and fairness to litigants will be furthered by assuming jurisdiction of the pendent claims. "[T]he flimsy nature of federal claims may call for dismissal of pendent state claims." *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1179 (2d Cir.1974). Of special significance here is the fact that the copyright claim is being dismissed without the need for a trial. Justice Brennan wrote in *Gibbs:* "Certainly, if the federal claims are dismissed before trial even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 727, 86 S.Ct. at 1139. Hart's and Wechsler's point seems apposite: "The dog would be wagged by its tail if plenary trial of an ancillary claim was compelled by a primary claim that could be disposed of on the pleadings." D. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *The Federal Courts and the Federal System* 925 (2d ed. 1978).

Our Circuit Court has indicated it will be "inclined" to view as an abuse of discretion the retention of state-law claims after dismissal of federal claims on motion under Rule 12(b)(6). *Nolan v. Meyer,* 520 F.2d 1276, 1280 (2d Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975). The federal claim here is dismissed after discovery, on a motion for summary judgment. Judge Friendly has advised that "[i]f it appears that the federal claims ... could be disposed of on summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit,* 491 F.2d at 1180. In *Kavit,* the Second Circuit reluctantly upheld jurisdiction of the state claims, although "without enthusiasm," citing as extenuating circumstances the fact that the litigation had dragged on for ten years, that the federal claims

had been dismissed only after trial, and that defendants had never throughout the long litigation questioned the jurisdictional sufficiency of the federal claim or sought to have their state claims adjudicated separately. *Id.* at 1179–80. No comparably compelling circumstances are present in this case. *See also Reese Publishing Co. v. Hampton International Communications,* 620 F.2d 7 (2d Cir.1980); *Fur Information and Fashion Council, Inc. v. E.F. Timme & Son, Inc.,* 501 F.2d 1048 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *Calderone Enterprises Corp. v. United Artists Theatre Circuit,* 454 F.2d 1292, 1297 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). These repeated admonitions against retaining jurisdiction after dismissal of the federal claims prior to trial provide important guidance in the present context.

A further compelling circumstance to consider here is the Supreme Court's statement that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. No special policy counseling a decision by this court of the state-law issues is implicated in this case, such as the policy in favor of avoiding federal constitutional questions, *see Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), or of vindicating claims which would be federally recognized but for a jurisdictional amount requirement, *see Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

Discretion suggests that this court is the proper forum to decide the unfair competition and preemption issues. Congress has specially recognized the propriety of considering state unfair competition claims that are joined with copyright claims, 28 U.S.C. § 1338(b), and the federal preemption issue is one which seems peculiarly appropriate for a federal court to consider so as to ensure that Congress' purposes are not undermined by state-law causes of action. But the state-law contract and breach of confidence claims present precisely the circumstances that normally support dismissal. While the unfair competition claim turns essentially on the same evidence and legal analysis as the copyright claim, the other state-law claims turn on evidence and legal principles that are largely different from and irrelevant to the federal claim. Furthermore, while comity would support deciding the preemption issues, the complexity and difficulty of the state-law issues, their peculiar importance to California's movie industry, and the special expertise of the state courts of California in dealing with the doctrines relied upon by plaintiffs weigh against the exercise of federal jurisdiction over these claims. *Compare Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) (proper to assume jurisdiction in copyright case of related unfair competition claim, but not of another, unrelated unfair competition claim).

The briefs filed by the parties amply demonstrate the difficulty of the issues presented. First, some doubt exists as to what law should be applied, and the laws of California and of New York differ in significant respects on the issues involved. *Compare Blaustein v. Burton,* 9 Cal. App.3d 161, 183, 88 Cal.Rptr. 319, 334 (2d Dist.1970) (idea revealed need not be novel), *with Ferber v. Sterndent Corp.,* 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980) (idea revealed must be novel).

If (as seems likely) California law applies, grave uncertainties nevertheless remain as to the proper decision in this case. California's courts have indicated a willingness to imply a contract by a producer or actor to pay for a writer's ideas, on the theory that such an agreement may reasonably be inferred from the nature of such relationships. But they as yet have not done so without an allegation that the party receiving the ideas had said something to indicate an agreement to pay. *See, e.g., Desny v. Wilder,* 46 Cal.2d 715, 299 P.2d 257 (1956); *Blaustein,* 9 Cal.App.3d 161, 88 Cal.Rptr. 319. Here, Smith does not claim that Weinstein said anything one way or

the other, and the parties' written contract is inconclusive. It has provided a basis for the parties to argue variously that it supports an inference that Weinstein implicitly agreed she would not use Smith's ideas without compensating him, and that it refutes such an inference. Furthermore, while California's courts have indicated they are relatively receptive to the tort of breach of confidential relation, that doctrine is a relatively recent creation, and has never been applied to protect ideas as mundane as plaintiff's. *Compare, e.g., Fink v. Goodson-Todman Enterprises, Ltd.,* 9 Cal. App.3d 996, 88 Cal.Rptr. 679 (Ct.App., 2d Dist.1970); *Minniear v. Tors,* 266 Cal. App.2d 495, 525, 529, 72 Cal.Rptr. 287, 292 (Ct.App., 2d Dist.1968). On the other hand, plaintiff's claimed relationship with Weinstein was closer than any dealt with in the reported California cases, and the spirit of some decisions appears to support imposing an obligation to pay upon recipients of ideas of any significant value who so actively solicit them from writers who trust that the ideas will be used only for their mutual benefit. *See Desny v. Wilder,* 46 Cal.2d 715, 299 P.2d 257, 267 (1956). That Smith insisted on a contract with Weinstein covering his rights, in the event his script were sold and his writing abilities were utilized, does not wholly negate his claim that he trusted Weinstein to use his ideas only for their mutual benefit.

The uncertainties posed by these and other issues stem ultimately from the fact that their resolution will depend upon policy determinations. The California Supreme Court and its Courts of Appeal have heretofore made these determinations after full consideration of the needs of that state's important movie industry. In *Desny,* for example, writer and producer organizations submitted briefs amici curiae, on which the Court relied. Plaintiff should seek decisions on the new issues he raises from the California courts, which have a substantial interest in ruling on them, and which will be able to render more "surefooted" readings in these relatively "uncharted areas of state law." Moore, *supra* at 18–64. *See generally* Note, *Breach of Confidence: An Emerging Tort,* 82 Colum.L.Rev. 1426 (1982); Note, *Beyond the Realm of Copyright: Is there Legal Sanctuary for the Merchant of Ideas,* 41 Brooklyn L.Rev. 284, 302 (1974).

Considerations of judicial economy and convenience, under the circumstances here, are of secondary importance. The parties here, it is true, have worked hard over several months on this case, and the court is now thoroughly familiar with the record and applicable law. But the bulk of the work expended would have been required to evaluate the federal question, and was in any event necessary to appreciate the uncertain nature of the state-law issues. Furthermore, summary judgment on the federal and unfair competition claims puts the litigation to rest for all defendants except Weinstein, who has requested dismissal without prejudice of the pendent state-law claims under *Gibbs.* Only the two remaining parties will be forced to undertake any additional expense. Nothing should prevent the parties, moreover, from using the discovery and briefs developed in this action in any subsequent litigation of the same issues. Finally, in considering expense and efficiency, the federal courts must weigh the long-term institutional benefits to be derived from a policy that discourages federal court adjudications of purely state-law questions in the absence of diversity of citizenship.

No unfairness has been alleged as likely to result from this determination. Nothing before the court would indicate that plaintiff will be unable to assert his state-law claims in the California courts. *Compare, e.g., O'Brien v. Continental Illinois National Bank & Trust,* 593 F.2d 54 (7th Cir.1979). A sound exercise of discretion would seem to permit, if not require, the dismissal of plaintiff's contract and breach of confidence claims under these circumstances. *See, e.g., Kavit,* 491 F.2d at 1180.

### III. *Unfair Competition.*

Plaintiff charges all defendants with unfair competition for their alleged use of his ideas. He contends that the similarity of

the film to his various works, and their focus on the prison rodeo, confused customers, damaged the marketability of his own script, and generated profits at his expense. Defendants deny all these allegations and argue as well that federal copyright law preempts this type of unfair competition claim.

The Copyright Act (the "Act") preempts state laws that protect rights equivalent to those protected by the Act. 17 U.S.C. § 301(a) (1976). To the extent that plaintiff relies on unfair competition to recover profits defendants derived from the use of his ideas, he is stating a claim based on rights equivalent to those protected by copyright. The claim is thus preempted under section 301(a). *See Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918–19 (2d Cir.1980); *Giangrasso v. CBS, Inc.*, 534 F.Supp. 472, 478 (E.D.N.Y.1982); *Decorative Aides Corp. v. Staple Sewing Aides*, 497 F.Supp. 154, 160 (S.D.N.Y.1980), *aff'd*, 657 F.2d 262 (2d Cir.1981). To the extent Smith uses unfair competition in a nonequivalent form, to protect against defendants' marketing of a similar product that engenders customer confusion as to source, *see* H.R.Rep. 1476, 94th Cong., 2d Sess. 132, *reprinted in* 1976 U.S.Code Cong., & Ad.News 5659, 5748; *D.C. Comics Inc. v. Filmation Associates*, 486 F.Supp. 1273, 1278 (S.D.N.Y.1980), he has offered no evidence of confusion. Given the lack of substantial similarity in the parties' respective works and the industry practice of according conspicuous screen credit to the actual authors, plaintiff's unsupported assertions that his name has acquired a secondary meaning as the originator of the prison rodeo movie concept and that viewers of defendants' work could be confused as to origin fail tó raise a genuine dispute of material fact. Summary judgment is therefore appropriate. *See Durham Industries*, 630 F.2d at 918.

### IV. *Preemption of State-law Claims Against Ms. Weinstein.*

In addition to the claims plaintiff asserts against all defendants, plaintiff advances separate claims against defendant Weinstein arising out of her alleged abuse of their relationship. Specifically, he alleges that Ms. Weinstein breached express and implied contracts, as well as their confidential relationship, when she disclosed to Columbia plaintiff's prison rodeo concept and various elements of his scripts. While the court will refrain from ruling on the merits of these claims for the reasons discussed above, a decision on the defendant's claim that they are preempted by federal copyright law seems either required as a federal question, or in any event appropriate under *Gibbs*. To the extent plaintiff rests his contract claim not on breach of the terms of the contract but on Weinstein's having copied his property, the KKK script, in making "Stir Crazy," it is of course preempted. Plaintiff cannot merely rephrase the same claim citing contract law and thereby obtain relief equivalent to that which he has failed to obtain under copyright law. *See* 17 U.S.C. § 301(a). But plaintiff also claims that Weinstein agreed, expressly or implicitly, to pay him for the value of his ideas if she decided to use them. A party may by contract agree to pay for ideas, even though such ideas could not be protected by copyright law. Rights under such an agreement are qualitatively different from copyright claims, and their recognition creates no monopoly in the ideas involved. Similarly, plaintiff's breach of confidence claim is nonequivalent to the rights one can acquire under copyright law; rather it rests on an obligation not to disclose to third parties ideas revealed in confidence, which obligation is judicially imposed only upon a party that accepts the relationship, and thus results in no monopoly. In short, these claims, narrowly read, focus on the relationship between individual parties and make actionable breaches of agreements between parties, or breaches of the trust they place in each other because of the nature of their relationship. *See* H.R.Rep. 1476, 94th Cong., 2d Sess. 132, *reprinted in* 1976 U.S.Code Cong. & Ad. News 5659, 5749; *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 501 F.Supp. 848, 852 (S.D.N.Y.1980); *Fink v.*

*Goodson-Todman Enterprises, Ltd.,* 9 Cal.App.3d 996, 88 Cal.Rptr. 679, 689 (1970).

In conclusion, defendants are granted summary judgment on plaintiff's copyright and unfair competition .claims. The court also holds that plaintiff's state-law claims are not preempted by federal law, as construed above, but those state-law claims are dismissed without prejudice to their assertion in an appropriate state court.

SO ORDERED.