Geoffrey T. WILLIAMS, Plaintiff,

v.

Michael CRICHTON, Alfred A. Knopf, Inc., Random House, Inc., Universal City Studios, Inc., MCA, Inc., Amblin Entertainment, Inc., Steven Spielberg, and David Koepp, Defendants.

No. 93 Civ. 6829 (LMM).

United States District Court, S.D. New York.

Aug. 17, 1994.

Jerome R. Halperin, Guy S. Halperin and Kyle Mallary Halperin, of counsel, Halperin Klein & Halperin, New York City, for plaintiff.

Richard Dannay, David O. Carson, of counsel, Schwab Goldberg Price & Dannay, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

On September 30, 1993, plaintiff Geoffrey T. Williams ("Plaintiff" or "Williams") brought suit against defendants Michael Crichton ("Crichton"), Alfred A. Knopf, Inc., Random House, Inc., Universal Studios, Inc., MCA, Inc., Amblin Entertainment, Inc., Steven Spielberg, and David Koepp (collectively "Defendants") alleging copyright infringement under the Copyright Act of 1976, *as amended,* 17 U.S.C. § 101, *et seq.,* and related claims for an accounting. Plaintiff complains that Defendants' works, the *Jurassic Park* novel (the "Novel") and the *Jurassic Park* motion picture (the "Movie"), infringe upon Plaintiff's earlier copyrighted works. Presently before the Court is Defendants' motion for summary judgment. For the reasons set out below, Defendants' motion is granted.

### I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must demonstrate the absence of any genuine issue of material fact. *See Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A fact is material when its resolution would "affect the outcome of a suit under governing law," and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party's "evidence . . . is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14).

The nonmoving party may not, however, simply either rest upon the allegations or denials contained in its pleading, *see* Fed.R.Civ.P. 56(e), or "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *accord Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. Rather, the nonmoving party must "present affirmative evidence . . . from which a jury might return a verdict in [its] favor." *Id.* at 257, 106 S.Ct. at 2514.

### II.

Construing the record in the light most favorable to Plaintiff, and drawing all inferences in Plaintiff's favor, *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990), *cert. denied,* 500

U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991), the facts are as follows.

Plaintiff Geoffrey Williams is the author of books intended for children between the ages of six and eleven years old. In his books, Williams incorporates and presents natural and scientific phenomena in the context of fictional adventure stories.

During the years 1985 through 1988, Williams created and published a series of four original copyrighted works of fiction for children bearing the following titles: (i) *"Dinosaur World,"* created and first published in 1985 (*"Dinosaur World"* or "Book I"); (ii) *"Lost in Dinosaur World,"* created in 1986 and first published in 1987 (*"Lost in Dinosaur World"* or "Book II"); (iii) *"Explorers in Dinosaur World,"* created in 1987 and first published in 1988 (*"Explorers in Dinosaur World"* or "Book III"); and (iv) *"Saber Tooth: A Dinosaur World Adventure,"* created and first published in 1988 (*"Saber Tooth"* or "Book IV") (together, the *"Dinosaur World* books"). Plaintiff applied for and was issued a Certificate of Registration by the Register of Copyrights for Book I in December 1988 (registration number TX–1–966–153); Book II in August 1993 (number TX–3–598–943); Book III in March 1988 (number TX–2–294–611);[1] and Book IV in November 1988 (number TX–2–541–662).[2] Plaintiff represents that collectively the Dinosaur World books have sold over 800,000 copies in the United States and elsewhere.

■ The setting of each of Plaintiff's children's books is "Dinosaur World," a place where visitors can "tour and observe dinosaurs and other pre-historic animals in a presumably safe, man-made, controlled environment." Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. ("Pl. Br.") at 7. Plaintiff's four children's books do not comprise a series of works in the sense of portraying the same characters or ongoing incidents and events in each book. Nonetheless, Plaintiff, citing *Warner Bros., Inc. v. American Broadcast-* *ing Cos., Inc.,* 530 F.Supp. 1187, 1193 (S.D.N.Y.1982) (*"Warner Bros.* I"), aff'd, 720 F.2d 231 (2d Cir.1983), and *Sid & Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir.1977), urges the Court to consider the works in their totality for the purpose of assessing his infringement claim against Defendants. The Court does not reach the issue of whether Plaintiff's works should be considered collectively, however, because, even so considered, the Court finds that there is no similarity between the parties respective works substantial enough to allow Plaintiff's claim to survive Defendants' motion.

### *Book I*

Plaintiff's first book, *Dinosaur World* (29 pages),[3] is a story about a visit by a young girl, Mary, and her father to Dinosaur World. When they arrive, they see many unfamiliar things: for example, plants that look like giant ferns, smoke rising from a volcano, and flying creatures that are not birds.

At the ticket booth, "Dad" pays the admission to a girl who hands him a small portable radio guide. The girl reads to Dad and Mary from the Official Dinosaur World Guide Book and tells them to observe all posted regulations, stay on the marked path, and for their own safety not to feed the dinosaurs.

As Mary and her father begin their tour, dozens of carnivorous dinosaurs "smaller than a chicken," Pl.'s Exh. A at 7, called compsognathus, run past Mary and her father. The radio guide informs them about these prehistoric animals.

Further down the path, Mary and her father hear waves as they approach a reproduction of the North American inland sea the park calls "Dinosaur Sea." They observe flying dinosaurs (pteranodons and pterodactyls), a "giant" turtle, and a predecessor of modern crocodiles (a tylosaurus). Continuing on the path, Mary and her father observe

---

**1.** Plaintiff applied for registration for Book III through the publisher Price Stern Sloan, Inc., which then assigned to Plaintiff all of its rights in the work.

**2.** In September 1993, apparently to correct a computer error, Price Stern Sloan, Inc., assigned to Plaintiff all rights to this work and made a subsequent filing with the Register of Copyrights.

**3.** The pages in the *Dinosaur World* books are unnumbered. For purposes of identifying material therein, all pages, including those containing only illustrations, are counted.

a series of other dinosaurs, with the radio guide supplying information. The two leave Dinosaur World soon after they observe, in a fenced pasture area, a tyrannosaurus rex stampede a group of triceratops dinosaurs.

In Book I, there is no menace or attack on humans by animals, and no fear of any danger to visitors. Plaintiff concedes that this book, viewed independently of the other *Dinosaur World* books, is not infringed by Defendants' works. Plaintiff asserts, however, the following, limited, assertedly protectible, similarities as indicative of infringement when the *Dinosaur World* books are viewed as a whole: (a) the first dinosaurs encountered by the reader are chicken-sized carnivorous animals (procompsognathus in the *Jurassic Park* novel) seen by a young girl on a beach, and (b) the stampede of a herd of dinosaurs chased by a tyrannosaurus rex.

### Book II

Plaintiff's *Lost in Dinosaur World* (30 pages) was written for older children than the audience intended for Book I; consequently, Book II presents a somewhat more "sophisticated" and detailed setting for the Dinosaur World park. There is a Petting Zoo and next to it the Dinosaur World Nursery in a building where ten dinosaur eggs have hatched the week before the story begins. Visitors receive at the entrance gate a map of the park and a radio guide to answer questions about the animals. Visitors can tour the park either by walking on marked paths or by riding the "T–Rex Express" through the dinosaur time periods represented in the park, observing the animals from the safety of the train.

In Plaintiff's characterization, similar to the *Dinosaur World* books generally, the story of *Lost in Dinosaur World* "has as its theme a presumably safe place inhabited by dinosaurs in a controlled environment where adults and children can visit, tour about and safely observe dinosaurs." Pl. Br. at 11. The setting includes

> tall pines rising overhead, along with exotic ferns, gingko and monkey puzzle trees; giant pterosaurs and pteranodons circling in the blue sky, their eerie, high-pitched squeals carrying across the distance;

roars, grunts and growls coming from deep in the forest, made by who-knows-what-kind of wild creatures....

Pl.'s Exh. B at 2. Despite the supposedly safe environment, Plaintiff asserts, "there is immediately a mood and feeling of mystery and menace surrounding the park." Pl. Br. at 11.

Book II begins with two children, Tim and Mary McDunn, and their parents readying to visit Dinosaur World for the first time. The boy's mother assures him: "We're just going to Dinosaur World, Tim. Not to the jungle or someplace dangerous." Pl.'s Exh. B at 1. Tim and his father discuss the first thing that Tim wants to do at Dinosaur World, which is to ride the T–Rex Express, and then to see an allosaur ("the scariest animal in the park," *id.*), a dinosaur assertedly similar to a tyrannosaurus rex.

After they arrive at Dinosaur World, the McDunn family receives their tickets, a map of the park and a small radio guide to answer any questions they may have about the animals. They discuss whether to first visit the nursery or to ride the T–Rex Express. Tim is impatient and wants to go directly to the train ride. His father, preferring to begin at the nursery, admonishes him: "Tim, it won't take but a few minutes, and I'm sure there'll be plenty of exciting things for you to do today." The narration continues: "Little did Mr. McDunn know how true that was." *Id.* at 4.

The story relates that the family then observes their first dinosaur, a brachiosaur, eating leaves from nearby trees. The radio guide explains that the brachiosaur is the largest land animal that ever lived. The family then enters the nursery, where the air is warm and humid, and views large protec-eratop eggs.

Next, the family takes the T–Rex Express rail tour of Dinosaur World. Only Tim's ticket is for the "SuperTour," which covers all the geologic time periods during which dinosaurs lived (the Triassic, Jurassic, and Cretaceous eras); the rest of the family is to view only the Triassic period. "After that Tim would be on his own. He was very excited." *Id.* at 8.

During the ride through the Triassic period, the train passes by the shore of the Dinosaur Sea where it is approached by a shrieking, twenty-five foot sea reptile (a nothosaur) with "needle-sharp teeth" and a neck that moves "like a snake." *Id.* at 11. Tim is left "a little frightened and wondering how much excitement the rest of the trip would bring." *Id.*

As the Triassic tour ends, Tim's family leaves the train, and his father hands him the radio and warns:

> "This is your first trip here, so be very careful not to lose your guide. Whatever you need to know, just ask. And remember, no matter what happens, don't get off the train."

*Id.* at 14. The narrative continues:

> Then they all waved good-bye. Tim watched until they disappeared from sight around a curve. He couldn't help feeling just a little lonesome as he continued his adventure.

*Id.* As the train continues through the Jurassic landscape, Tim, now alone, doing "something that would change his whole day," *id.* at 15, accidentally bumps the radio off the train, where it falls under the tail of a stegosaur, a large, herbivorous dinosaur. When Tim retrieves the radio, the train leaves without him. Alone in the park, Tim is warned by the radio guide about the allosaur, an animal "that stood over twenty feet tall, had teeth like steak knives and a disposition like a bucket of rattlesnakes." *Id.* at 18. "[N]ow Dinosaur World seemed mysterious. Strange. Perhaps even ... dangerous." *Id.* at 20.

Walking on his own, Tim encounters a lost baby duckbill dinosaur (parasaurolophus). Tim feeds it, and the dinosaur follows him through the park. An allosaur soon emerges from the trees to chase Tim and the baby dinosaur. Closely pursued, Tim and the baby dinosaur escape into the Dinosaur Sea, just ahead of the allosaur that "was furious at seeing his dinner just out of reach." *Id.* at 14.[4]

After other incidents, the story ends when another roaring dinosaur turns out to be the T–Rex Express returning to take Tim back to his parents.

### *Book III*

Plaintiff's *Explorers in Dinosaur World* (30 pages) is intended for audiences approximately eleven years old. The story centers on two children, Peter and his sister Wendy who, by virtue of Wendy's luck in a radio station contest, win the opportunity to preview the opening of "Dinosaur World's newest attraction—Pangaea—the island of mystery in the middle of Dinosaur Sea." Pl.'s Exh. C at 5.

Peter, a dinosaur enthusiast, and his sister Wendy are to spend a weekend at Pangaea exploring the jungles and beaches guided by Jake DuMel, a key figure in designing Pangaea. Jake greets the children as they arrive at Dinosaur World, and walks them past the Petting Zoo, the snack stands and the Nursery as they make their way to the boat dock. Uniformed Dinosaur World staff are also present: engineers for the T–Rex Express, keepers of the Nursery, gardeners, and staff scientists are mentioned in the text. On their way to the dock, Peter, Wendy and Jake see various types of dinosaurs, some of which are being monitored by staff taking notes.

Pangaea, about a half-mile from the mainland, appears "ghostly and mysterious." *Id.* at 10. Jake checks the children's backpacks and gear, including a radio. "We need it to call for help if we get into any trouble," Peter says to his sister. Jake adds, "Dinosaur World is full of surprises, not trouble. Still, you can't be too careful...." *Id.* at 11.

As they cross the water to the island, the party is pursued by an elasmosaur, a sea creature with a neck over 20 feet long. The serpent-like dinosaur arches over the boat with sharp teeth in view. The elasmosaur, however, is distracted by other prey, and the party escapes. Before they reach the island, the party also evades another sea dinosaur, a

---

**4.** Plaintiff describes this event as an "attack" on Tim and his companion, Pl.Br. at 15, but the story makes clear that there is never any physical contact between the human characters and any of the aggressive animals.

kronosaur, which roars "in frustration and anger" as it watches "its breakfast escape." *Id.* at 15.

Jake and the children then reach Pangaea, "a world impossibly old and, at the same time, wondrously new," *id.* at 16, where they are the first visitors. As they reach the shore, they first see an apetosaur "bigger than a moving van," *id.*, and then a saltopus dinosaur, "no bigger than a cat," runs by "on its hind legs, bent over, balancing itself with its long tail." *Id.* at 17.

On Pangaea, Jake warns the children about deinonychus dinosaurs, carnivores "ten feet long [that] run like the wind, hunt in packs like wolves, are always hungry, and have extremely long, sharp claws." *Id.* at 18. "You can't see them from here," Jake says, "[b]ut there are special fences that keep dangerous dinosaurs from wandering into the areas where we'll be going." *Id.*

After an uneventful night camping on the island, Jake receives a warning on the portable radio:

"Security reports a break in the perimeter fencing on the east side of the lake."

"How bad is it, Main Base?"

"Bad enough. Tracking computers indicate a pack of deinonychus is on the loose, and Jake ... they're heading your way. Suggest you make for the chopper pad. We have a bird on its way now. You should have plenty of time to make it. Do you copy?"

"We're on our way. This is Pangaea Camp One over and out." Jake was all business now. "You heard him. Let's go, kids."

*Id.* at 24.

As they seek to reach the helicopter pad, the party is confronted by a large dinosaur in their path, an ankylosaur, protected by bony plates, thick skin, spikes, and a club-like tail. As the deinonychus approach, the ankylosaur fights them off, enabling the characters to escape to the helicopter and depart from the island.

### Book IV

Plaintiff's *Saber Tooth* (30 pages), written in 1988 for children of the approximate age of six, is set in a not yet opened area of Dinosaur World, "Prehistoria."

The story's children, Mimi and Barry, sneak into the new area and board an automated cable car and ride through landscape from the Cenozoic period, an era after dinosaurs became extinct. The cable car is equipped with an automated recorded guide which provides information about prehistoric animals when a button is pushed next to the animal's picture.

The children are the first outsiders to visit Prehistoria. On their tour, they observe and come into contact with sabertooth cats and other prehistoric animals.

The only elements of similarity Plaintiff asserts between *Jurassic Park* and Book IV is the setting of an animal park for prehistoric animals visited by children and the automated technology used in the cable cars. Plaintiff concedes that Book IV, considered alone, has not been infringed.

### Jurassic Park

The *Jurassic Park* novel (400 pages), intended for an adult readership, was first published in 1990, and the two hour movie of the same title was released in 1993.

Like Plaintiff's works, *Jurassic Park* also centers around a type of dinosaur zoo. However, both the Movie and the Novel contain substantially more sophisticated plot and character development than Plaintiff's works. For instance, in *Jurassic Park*, the creation of the park involves issues of genetic engineering and financial intrigue that nowhere appear in Plaintiff's works. On the contrary, in all of Plaintiff's works, the establishment of the park is a given; in *Jurassic Park*, the issue of how the park was, and whether it should be, developed is a substantial aspect of, if not central to, engagement of audience interest. The respective tales also end in fundamentally different manners: in each of Plaintiff's stories, all the characters emerge unharmed—indeed, in Plaintiff's works there is never any physical contact between a hu-

man and a dinosaur[5] and, there being no serious permanent safety questions, the park exhibits remain open or scheduled to open to the general public. For instance, in Book II, the sum total of the effects of Tim's adventures is that they "change his whole day." Pl.'s Exh. B at 15. By the end of *Jurassic Park*, on the other hand, several characters have been killed or wounded, and the park is an obvious safety disaster, never to open.

## III.

Copyright infringement may be established by "showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993). *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994) (citations omitted). For purposes of the instant motion only, Defendants concede access to Plaintiff's works. Mem. Law Supp. Defs.' Mot. Summ. J. at 26. Thus, in order to decide Defendants' motion, the Court turns to the question of substantial similarity.

Traditionally, summary judgment was discouraged in copyright infringement cases because "substantial similarity" is customarily a close question of fact. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.) (citing *Arnstein v. Porter*, 154 F.2d 464, 468 and 474 (2d Cir.1946)), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, the Second Circuit has since "recognized that a district court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only '*non*-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983) ("*Warner Bros.* II") (emphasis in original, citations omitted). *See also Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir.1992).

"The basic issues concerning [a] copyright infringement claim are whether the ... works are substantially similar so as to sup-

port an inference of copying and whether the lack of substantial similarity is so clear as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury." *Warner Bros.* II at 239. "The similarity to be assessed must concern the expression of ideas, not the ideas themselves," *id.* (citing *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)), and *Nichols v. Universal Picture Corp.,* 45 F.2d 119, 121 (2d. Cir.) (L. Hand, J.), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), "a distinction easier to assert than to apply," *Warner Bros. II,* 720 F.2d at 239, and necessarily an *ad hoc* enterprise. *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir.1980) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960)).

"The test for substantial similarity is most concretely stated as 'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Smith v. Weinstein,* 578 F.Supp. 1297, 1302 (S.D.N.Y.) (quoting *Ideal Toy Corp. v. Fab–Lu, Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)), *aff'd,* 738 F.2d 419 (2d Cir.1984); *see also Durham Indus.,* 630 F.2d at 911–12; *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1351–52 (S.D.N.Y.1986); *Steinberg v. Columbia Pictures Industries, Inc.,* 663 F.Supp. 706, 711 (S.D.N.Y.1987). Only similarities of significance are to be considered, *Durham,* 630 F.2d at 912, and in comparing two works, a court must ignore a work's unprotectible aspects. *Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 765–66 (2d Cir.1991); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 141 (2d Cir.1992); *Novak v. National Broadcasting Co., Inc.,* 716 F.Supp. 745, 752 (S.D.N.Y.1989).

While Plaintiff concedes that the idea of a dinosaur zoo is unprotectible, Pl. Br. at 7, he nonetheless asserts that a factual issue regarding substantial similarity is to be found in a comparison of the following elements of the works at issue.

---

**5.** The single exception is Tim's friendly encounter with a juvenile duck bill dinosaur in Book II.

### Total Concept and Feel

In comparing the "total concept and feel" of works, similarities in "mood, detail or characterization" must be considered. *Reyher*, 533 F.2d at 91–92. Consideration of "total concept and feel" is especially appropriate in an infringement claim involving inherently less complex children's works. *Id.* at 91. Where there is a marked difference in total concept and feel, summary judgment is appropriate. *Id.* at 92; *see also Denker v. Uhry*, 820 F.Supp. 722, 731 (S.D.N.Y.1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993).

Plaintiff contends that the "total concept and feel" of his works is substantially similar to the menacing mood conveyed in *Jurassic Park*. The Court must disagree. Although Plaintiff's works contain certain chase scenes and "near misses," the overall tone and presentation of the work leaves the reader confident that the characters will emerge unharmed, as they indeed do. Instead of the real threat and actual incidents of violence found throughout *Jurassic Park*, the adventure park setting of Plaintiff's works functions to instill in the reader the feeling that, however exciting the adventures might become, no harm will come to the characters.[6] In fact, this confidence is only bolstered when the Dinosaur World books are read together: as the reader approaches each new story, the memory of the happy endings of the prior tales strongly suggests a similar result about to unfold.

Thus, although Plaintiff contends that his works, to a child, are menacing, terrifying and violent, there is in fact never violence done to any of Plaintiff's characters, and the underlying sense of security that pervades these works would preclude a reasonable jury from finding its mood substantially similar to that of Defendants' works.

6. Plaintiff's reliance on "Welcome to Jurassic Park," Pl.'s Exh. F, a print publication intended for children based on the Movie, to bolster his claim is without merit. Although it may be interesting that "Welcome to Jurassic Park," written for young children (three to eight years old), omits Crichton's technological and economic

### Theme

Copyright protection does not extend to thematic concepts or scenes which must necessarily follow from similar plot situations. *Smith*, 578 F.Supp. at 1302 (quoting *Reyher*, 533 F.2d at 91). "In assessing claims of substantial similarity, courts ... must decide 'whether the similarities shared by the works are something more than mere generalized idea or theme.'" *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48–49 (2d Cir.1986) (quoting *Warner Bros. v. American Broadcasting Co., Inc.*, 654 F.2d 204, 208) (2d Cir.1981). Themes commonly repeated in a certain genre are not protectible by copyright, *American Direct Marketing, Inc. v. Azad Int'l, Inc.*, 783 F.Supp. 84, 95 (E.D.N.Y. 1992), as no one can own the basic idea for a story. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985). Rather, similarities must be found in plot, characters, dialogue, mood, setting and pace. *Reyher*, 533 F.2d at 91.

Although Plaintiff concedes that *Jurassic Park* "is a much more complex work than that of plaintiff's works for children," Pl.Br. at 32, he nonetheless contends that the works at issue are substantially similar with respect to theme. This common theme, Plaintiff asserts, "is that a visit to, and tour of, an animal park for prehistoric dinosaurs (if one were to exist) would not only be wondrous and exciting, but also very dangerous." Pl. Br. at 32.

The Court cannot agree that this description accurately portrays the theme of *Jurassic Park*, or even, necessarily, Plaintiff's works. Plaintiff's representation of *Jurassic Park* entirely abstracts the theme park adventure from its context and omits any reference to its fundamental story elements of genetic engineering, ego, and greed. *See Jones v. CBS, Inc.*, 733 F.Supp. 748, 753 (S.D.N.Y.1990) ("[A]ll fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other

themes, and portrays no harm coming to its characters, reference to this subsequent work is irrelevant both because its authorship differs from that of the allegedly infringing works and, more importantly, because it is in fact not among the works at issue in the instant lawsuit.

plots").[7] Indeed, a fairer representation of *Jurassic Park*'s theme is that meddling with nature can be disastrous, and that such activities are only compounded when judgment is clouded by greed and other human shortcomings. No such theme is evident in any of Plaintiff's stories. Rather, the essence of Plaintiff's work is more fairly described as a simple vehicle to introduce the subject of dinosaurs and to satisfy childhood curiosity about the creatures. *See also Reyher*, 533 F.2d at 92–93 (different moral emphases may also distinguish works).

### Setting

■ Similarity in the basic setting of a work of fiction is not by itself actionable, *Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 683 F.2d 610, 626 (2d Cir.1982); although it may be a factor in a determination of substantial similarity, setting alone can not constitute infringement. *See also Alexander v. Haley*, 460 F.Supp. 40, 45 (S.D.N.Y.1978) (setting and theme, "the skeleton of a creative work rather than the flesh, are not protected by the copyright laws").[8]

■ Nonetheless, Plaintiff points to several similarities in the setting of the respective works.[9] Indeed, the settings of the works are such that a reasonable jury could find them substantially similar.[10] These similarities, however, all flow from the concededly uncopyrightable concept of a dinosaur zoo. Pl. Br. at 7. As such, the corresponding scenic elements are *scenes a faire* that "follow naturally from the work's theme rather than the author's creativity." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 715 (2d Cir.1992) (quoting 3 M. & D. Nimmer, Nimmer on Copyright § 13.03[F][3], at 13–65), and are likewise unprotectible. *See also Reyher*, 533 F.2d at 91 ("Copyrights, then, do not protect thematic concepts or scenes which necessarily must follow from certain similar plot situations"); *Burroughs*, 683 F.2d at 627 ("[n]aturally there are certain similarities required by Tarzan's character and the jungle setting"); *Walker*, 784 F.2d at 50 (*scenes a faire, i.e.*, "scenes that necessarily result from the choice of a setting or situation," and " 'stock themes' commonly linked to a particular genre," are not protected by copyright); *Berkic*, 761 F.2d at 1293 ("all situations and incidents which flow naturally from a basic plot premise, so-called *scenes a faire*," are not protected against copying); *Alexander*, 460 F.Supp. at 45 ("[a]ttempted escapes, flights through the woods pursued by baying dogs, the sorrowful or happy singing of slaves, the atrocity of the buying and selling of human beings, and other miseries" are all *scenes a faire*, "indispensable, or at least standard, in the treatment of a given topic").

Thus, although there are certainly similarities to be found between the works' settings, as these all "flow naturally from the basic plot premises" of a dinosaur zoo, such simi-

---

7. Learned Hand commented to similar effect:

> Upon any work, . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement about what the [work] is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected. . . .

*Nichols*, 45 F.2d at 121 (as quoted in *Walker*, 784 F.2d at 49).

8. The Court notes that Crichton had already used the device of a theme park gone awry in the 1973 movie Westworld. *See* Defs.' Exh. 21.

9. These include the following elements: (1) both Pangaea (from Plaintiff's Book III) and Jurassic Park are volcanic islands with arguably similar foliage and geologic features; (2) both Pangaea and Jurassic Park are not yet open to the general public (although, unlike Pangaea, Jurassic Park is never to open); (3) both parks employ "special fences" to separate dangerous dinosaurs from visitors; (4) in both parks visitors ride on automated cars and go on self-guided tours; (5) visitors to both parks are provided radios which describe the parks and their inhabitants; (6) both parks contain nurseries where dinosaur eggs are hatched; (7) both parks employ workmen, guides and dinosaur keepers dressed in uniforms; (8) both parks employ staff scientists who study the parks' dinosaurs; and (9) both parks employ gardeners to tend the park's special flora.

10. The Court notes, however, that Defendants assert that even the settings are distinct, primarily on the grounds that Jurassic Park is located off the coast of Costa Rica and, because of its relatively inaccessible location, is equipped with hotels, restaurants and recreational facilities, features apparently absent from Dinosaur World's quasi-suburban location.

larities cannot support Plaintiff's infringement claim.

### Time Sequence

Plaintiff argues that there is substantial similarity between the time sequences of the works at issue, arguing that "[a]ll of the action involving the children takes place within 24 hours at the dinosaur park." Pl. Br. at 35. Plaintiff, however, is able to truncate *Jurassic Park* to a single day's action only by restricting his consideration to action which involves the children, characters whom Plaintiff portrays as central to Defendants' works. Such a restriction, however, requires one to ignore not only important action contained in *Jurassic Park* that proceeds the park episodes, but also important implied and reported background concerning scientific research, park financing, recruitment of key park personnel, mining activity to provide dinosaur DNA, and so forth. Moreover, Plaintiff's characterization cuts off an implied time sequence trajectory concerning what the future will bring in a world for the first time inhabited simultaneously by humans and unconfined dinosaurs.

### Pace

Viewed in a light most favorable to Plaintiff, the Court believes there is a basis to find similarity between the pace at which *Jurassic Park* and Plaintiff's Book III proceed. These works entail, at least in part, quick transitions from one dinosaur confrontation to another, punctuated by a hasty helicopter escape. Without more, however, such similarity is insufficient to create an issue of overall substantial similarity between the works.

### Characters

With respect to their characters, the works are quite distinct. Plaintiff here again attempts to preserve the issue of substantial similarity by confining his consideration to the role of the children (Tim and Alexis in *Jurassic Park*, Peter and Wendy in Book III), along with their respective guides (Dr. Grant and Jake DuMel). Plaintiff asserts the following similarities:

Both boys are presented as dinosaur enthusiasts; in both works, the respective guides are knowledgeable about dinosaurs. Both boys are eager to talk about dinosaurs with the respective experts, and Dr. Grant's movie portrayal, Plaintiff asserts, dovetails with that of Jake DuMel: both are intelligent, rugged adventurers who are friendly and somewhat paternalistic toward the children.

The children in both works are brother and sister, and in both works camp out with their guide on the park island. They are together when threatened by dangerous dinosaurs, and at the end of both stories, both parties arrive safely at the helicopter pad as a result of the combined efforts of the children and their accompanying adult.

Even accepting Plaintiff's character descriptions as accurate, the characters of the works nonetheless fall far short of the substantial similarity required to preserve a factual question for trial. This shortcoming is twofold.

First, Plaintiff has artificially limited his claims to a select few of the *Jurassic Park* characters. Upon consideration of the many other characters in evidence in both the Novel and the Movie, it is apparent that *Jurassic Park* presents a universe of characters quantitatively far richer than anything attempted in any of the *Dinosaur World* stories.[11]

Second, even considering only those characters Plaintiff discusses, the characters of the *Dinosaur World* books are much more thinly developed than those of *Jurassic Park*. No character infringement claim can succeed, however, unless Plaintiff's original work sufficiently developed the characters at issue. *Smith,* 578 F.Supp. at 1303 (quoting *Warner Bros. I,* 530 F.Supp. at 1193). *See also Bevan v. Columbia Broadcasting System,* 329 F.Supp. 601, 605–606 (S.D.N.Y.1971) (Hogan's Heroes does not infringe upon Stalag 17, though both feature a prison camp guard named Sergeant Schultz). Here, neither Wendy or Peter, nor any of Plaintiff's char-

---

11. Important *Jurassic Park* characters Plaintiff has failed to discuss include Hammond, Malcolm, Sattler, Gennaro, Nedry, Wu, Muldoon, Harding, and Arnold.

acters are well-developed enough to justify protection.

In the *Jurassic Park* novel, Tim and Alexis are brought to Jurassic Park as part of their grandfather Hammond's strategy to influence the decision about the park's safety, and their parents' divorce figures into the story as the pretext for their presence in the park during its inspection. Wendy and Peter, on the other hand, are at the park as contest winners, have no preexisting familial or personal relationship to anyone affiliated with the park and, other than Peter's enthusiasm for dinosaurs, they bring no helpful specialized skills or knowledge with them to the park. By contrast, in the Novel, Tim's knowledge of computers is key to keeping raptors from arriving on the mainland, while in the Movie, all the characters are benefited by Alexis' computer acumen in restoring park security systems.

Further, the children's relationship with their respective "guides" varies significantly. Although by the end of the works, the respective relationships could be described as "friendly," in *Jurassic Park*, the relationship in no way begins as such. In *Jurassic Park*, the children are thrown together with Dr. Grant solely as a result of the disasters that beset the park. Moreover, the association of Dr. Grant and the children in the Movie includes an ironic element, as Grant's discomfort with children has been foretold in prior discussions with his colleague and paramour, Dr. Ellie Sattler, about whether to have children. In Book III, on the other hand, Jake DuMel's relationship as the children's personal tour guide is planned, and DuMel's demeanor toward the children is appropriately polite and cordial from the outset. In contrast with Dr. Grant's extensive paleontology credentials, we know nothing of DuMel's professional training, romantic life, or feelings about raising children.

Thus, only three of *Jurassic Park*'s major characters can be found to have any analog in the *Dinosaur World* stories. Moreover, even these three, beyond their superficial similarity to certain of Plaintiff's characters, are much more fully developed in *Jurassic Park*. As Learned Hand instructed, "the

less developed the the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols*, 45 F.2d at 121. Consequently, the Court concludes that no reasonable jury could find substantial similarity between the characters of the works at issue.

### Sequence of Events

Plaintiff also claims that the sequence of events between his four works and the *Jurassic Park* movie and novel is "strikingly similar." Pl.Br. at 36. In support of this contention, Plaintiff cites the following events:

In Book III and *Jurassic Park*, two children have the opportunity to tour a dinosaur theme park prior to its opening for the general public. In Book I and in the Novel, the first dinosaurs encountered by the readers are small, and compared in size to a chicken, and in Book III and the Novel, Plaintiff asserts, the first dinosaur is described as walking "on its hind legs" and balancing itself on its large tail. Pl.s' Exh. C at 17; Defs.' Exh. 5 at 14.[12] In Book II and the Movie, the first dinosaur the visitors see in the park is a brachiosaur eating from a tree. Both Plaintiff's Book III and the Novel describe the respective characters' first arrival at the theme parks as entering a "new world." Pl.s' Exh. C at 16; Defs.' Exh. 5 at 85. Tours described in Book II and *Jurassic Park* are preceded by visits to humid nurseries, and where (in Book II and the Novel) one of the children expresses interest in lingering to play with the baby dinosaurs before proceeding with the rest of the tour.

In Books I and IV and *Jurassic Park*, visitors tour the park in trains, cable cars, and automated cars, respectively, and are informed by radio guides or prerecorded announcements; in both Book IV and the Movie, visitors can access information by touching a screen or button corresponding to an animal's picture.

In Books II and III and in *Jurassic Park*, the climactic action scenes begin after the tours are underway. In Book II, Tim's diffi-

---

12. In fact, the first dinosaur seen on Pangaea is an aptosaur. Pl.'s Exh. C at 16.

culties begin when his radio falls and breaks; in *Jurassic Park*, trouble starts after the park-wide break-down of the two-way radio system. In both Book II and *Jurassic Park*, the stranded characters are without transportation when they first encounter a large dinosaur (an allosaur in Book II, and a tyrannosaur in *Jurassic Park*). While the children in all the works "escape being eaten," Pl.Br. at 40, in *Jurassic Park*, other members of the party are not so fortunate, and even the children do not escape physical trauma when their vehicle is destroyed.

In Book III and *Jurassic Park*, control fences break down, allowing dinosaurs to roam the parks unrestricted. Both the Novel and Book III contain scenes in which the children and their respective guides are in a boat and threatened by a large dinosaur which is ultimately distracted by other prey. Both Book I and the Movie contain scenes of smaller dinosaurs stampeded by a tyrannosaur. In Book III and *Jurassic Park*, parties comprised of children and their guides spend one night in the wild, the audience is initially startled by a dinosaur which turns out to be herbivorous. The next day, in both Book III and *Jurassic Park*, the visitors escape velociraptors in part due to the intervention of another dinosaur, and the parties reach safety when a helicopter takes them from the island. Only Book III's overnight, however, can fairly be characterized as "camping out," as Plaintiff does; in *Jurassic Park*, after a series of calamities, including the death and injury of fellow visitors, and the collapse of park safety features, the children and Dr. Grant spend the night hiding in a tree (Movie) or maintenance shed (Novel).

Plaintiff's comparison of these highly selective, scattered details, however, is not enough to warrant a finding of substantial similarity between the works. *Walker,* 784 F.2d at 50; *Burroughs,* 683 F.2d at 624 ("the few purported similarities either are so general as to be meaningless, or are not similarities at all"); *see also Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985) (such lists of similarities are "inherently subjective and unreliable," particularly where "the list emphasizes random similarities scattered throughout the works").

For instance, Plaintiff cites incidents involving "chicken-sized" dinosaurs occurring in both authors' books as evidence of the respective works' similarity. These incidents, however, signal the works' fundamental differences: in Plaintiff's work (Book I), the chicken-sized dinosaurs are simply an amusing sight; in the Novel, the chicken allusion is part of an early scene culminating in a violent attack on a child, signalling to the audience danger at the outset. Moreover, in the Novel, this incident has occurred on the mainland outside the park's boundaries. Thus, the *Jurassic Park* audience is left with questions concerning compromised human safety even beyond the borders of the park itself. Nonetheless, in his attempt to assert substantial similarity, Plaintiff represents only the respective dinosaurs' size and how they use their tails in locomotion. Pl.Br. at 36–37. *See, e.g., Bevan,* 329 F.Supp. at 605 (rejecting "[q]uantitatively impressive" list of "apparent similarities" that "break down under the closer, detailed examination which the copyright law requires" because a comparison focusing "on the dramatic mood, the details and interplay of the characters, and the dynamic of events indicates such substantial dissimilarity" as to bar verdict for plaintiff).

Moreover, because Plaintiff effectively mixes and matches from six works, the opportunities for identifying similar details is greatly enhanced. Even considering the works together, the Court believes that such a comparison should focus on identifying important congruences only; to weight similar nonessential details discovered in such an exercise would seem as a general matter to allow a plaintiff to cast too wide a net.

Thus Plaintiff, although having sifted the works to produce a list of similarities, often not essential to the stories, has at the same time ignored major characters and events in *Jurassic Park* that do not comport with his theory of the case. Consequently, even assuming the accuracy of the various similarities in details as represented by Plaintiff, a finding of substantial similarity cannot be supported.

*IV.*

For the foregoing reasons, Defendants' motion for summary judgment is granted, and Defendants may have judgment dismissing the Complaint.

SO ORDERED.